## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CESAR LEE, | : | |
|    Plaintiff. | : | |
| | : | |
|      v. | : | Civ. No. 11-195 |
| | : | |
| LISA P. JACKSON, et al., | : | |
|    Defendants. | : | |

Diamond, J.                                                                                          May 14, 2013

## MEMORANDUM

Plaintiff Cesar Lee worked as an Environmental Engineer in the Environmental Protection Agency's Philadelphia Office when he was fired on March 27, 2009, for poor performance. (MSPB R. tab 4b.)   The Merit System Protection Board affirmed the EPA's termination decision. Lee v. E.P.A., 115 M.S.P.R. 533 (2010).   Plaintiff now proceeds against the EPA's Administrator and the Agency itself, challenging the evidentiary sufficiency and procedural adequacy of his firing.   See 5 U.S.C. §§ 4301, et seq.   He also alleges, under Title VII, that the EPA fired him because he is Chinese-American.   42 U.S.C. §§ 2000e, et seq.

The Parties have cross-moved for summary judgment.   I will enter judgment for the Government.

## PROCEDURAL HISTORY

From 2003 to 2009, Plaintiff served as the Federal Agency Hazardous Waste Compliance Docket Coordinator for EPA Region III.   (MSPB Hrg. Tr. 276:20-22.)   The EPA is required to maintain the Docket, which tracks and identifies hazardous waste facilities "that should be evaluated to determine if they pose a threat to public health or welfare and the environment." Federal Agency Hazardous Waste Compliance, 73 Fed. Reg. 71,644, 71,644-45 (Nov. 25, 2008).

Among the Coordinator's tasks is delisting from the Docket "small quantity" hazardous waste generators because they pose no significant threat.   (MSPB R. tab 4s; <u>see also</u> MSPB Hrg. Tr. 87:20-23.)   Sites listed on the EPA's "National Priorities List," however, are significant hazardous waste generators that warrant close monitoring.   (MSPB R. tab 26y.)   The Coordinator is instructed that "NPL" sites "**must** be listed on the Docket."   (MSPB R. tab 4g, at 2.)   Mistakenly delisting an NPL site could disrupt EPA monitoring, and so create an environmental or health hazard.   <u>See</u> Federal Agency Hazardous Waste Compliance, 73 Fed. Reg. at 71,644-45.

The EPA evaluated Plaintiff through its "Performance Appraisal and Recognition System," by which the Agency puts employees on "performance plans" comprised of two to five "critical elements."   (<u>See</u> MSPB R. tab 4w.)   As the name suggests, each "PARS" critical element is an "assignment or responsibility of such importance that unacceptable performance on the element would result in a determination that an employee's overall performance is unacceptable." 5 C.F.R. § 432.103(b); (MSPB R. tab 4w, at 4.)   Although a performance plan may contain no more than five critical elements, each element may comprise multiple "subelements."   <u>See, e.g.</u>, <u>Rogers v. Dep't of Def. Dependents Sch.</u>, 814 F.2d 1549, 1554 (Fed. Cir. 1987).

The Agency "grades" performance on each critical element.   "Unacceptable," is the lowest rating and reflects late work; "frequent deficiencies in creativity, skill, and knowledge;" and a regular lack of clarity in both verbal and written communications.   (MSPB R. tab 4h, at 4.) Although a "Minimally Satisfactory" rating reflects "occasional" deficiencies of the same nature, it is sufficient to preclude termination for poor performance.   (MSPB R. tab 4h, at 4; <u>see also</u>

MSPB Hrg. Tr. 136:17-20.)  A "Fully Successful" rating indicates an "acceptable level of competence," and warrants normal advancement of pay grade. (MSPB R. tab 4w, at 4.)  Ratings of "Exceeds Expectations" and "Outstanding" denote work of a "superior" or "exceptional" quality.  (MSPB R. tab 4h, at 4.)

On January 1, 2007, the EPA put Plaintiff on a performance plan whose first critical element—"Program/Project Management"—required him to "ensur[e] that the information in the [Region III] Docket is accurate."  (MSPB R. tab 4u, at 3.)  In November 2007, after Plaintiff's performance respecting that critical element was deemed "Unacceptable," the Agency placed him on a "Performance Improvement Plan."  (MSPB R. tab 4u, at 5.)  The 2007 "PIP" required Plaintiff to "ensure that the information in the Docket was consistent with the information in CERLIS."  (MSPB R. tab 4u, at 12.)  The "Comprehensive Environmental Response, Compensation, and Liability Information System" is a database that, like the Docket, tracks hazardous waste facilities.  Reviewing Plaintiff's work at the conclusion of his 2007 PIP, Plaintiff's supervisor, Kathleen Anderson, observed that when crosschecking the Docket against CERLIS,

> [t]he most fundamental piece of information is the name of the site. However, you only made sporadic corrections to names of the sites in the spreadsheet. The same is true for addresses. Most alarming, however, are the "corrections" you did make.  In almost all cases where you changed the zip code it was to a zip code for a city outside of the State altogether. For instance, many of the zip code changes for sites in Maryland were to zip codes for cities in Virginia and Pennsylvania and, in one case, California, even though no other changes in address were made. At one site in [Maryland], you changed not only the zip code but the entire address of a site that was entered correctly in both the spreadsheet and in the Docket. These types of inexplicable mistakes render your work on this assignment highly unreliable.

(MSPB R. tab 4u, at 12-13.) Plaintiff's remaining work received an equally poor evaluation. (MSPB R. tab 4u.) His rating thus remained "Unacceptable." (MSPB R. tab 4u, at 11-14.)

As set out more fully in my discussion of evidentiary sufficiency, over the next year, Plaintiff repeatedly failed adequately to perform his most basic job duties. In February 2008, the EPA put Plaintiff on a new performance plan, comprised of three critical elements. (MSPB R. tab 4h, at 1-12.) Critical Element #1 set out Plaintiff's primary duties as Docket Coordinator: "ensur[ing] that the appropriate facilities are listed on the Docket accurately and in a timely manner." (MSPB R. tab 4h, at 5.) Plaintiff's performance on Critical Element #2 ("Customer Service") and #3 ("Teamwork") was rated "Fully Successful"—an "acceptable level of competence." (MSPB R. tab 4h.) As to Critical Element #1, however, his performance was "Unacceptable." (MSPB R. tab 4h.) Accordingly, Anderson informed Plaintiff that she was placing him on a second 60-day PIP. (MSPB R. tab 4t.) At the PIP's conclusion Anderson again rated "Unacceptable" Plaintiff's performance of his primary duties. (MSPB R. tab 4g;) see also 5 C.F.R. § 432.103(b). Thus, on March 27, 2009, the EPA terminated Plaintiff. (MSPB R. tab 4b.)

Plaintiff appealed his termination to the Merit Systems Protection Board. (MSPB R. tab 1.) After a two-day hearing, Administrative Judge Kara L. Svendsen upheld the firing. (MSPB R. tab 43.) The Board affirmed the ALJ's decision, and Plaintiff brought the instant action. Lee v. E.P.A., 115 M.S.P.R. 533 (2010).

Plaintiff alleges that there is insufficient evidence in the administrative record to support his firing (Count I), that his removal was procedurally invalid (Count II), and that national origin discrimination impermissibly figured in his termination (Count IV). On October 11, 2012,

4

Plaintiff dismissed Count III of the Complaint by stipulation.   (Doc. No. 25.)

## ADMINISTRATIVE APPEAL

### I.      Legal Standards

"Under 5 U.S.C. § 7703(c), judicial review of a termination decision by the MSPB is limited to review of the administrative record."   Harold v. Barnhart, 450 F. Supp. 2d 544, 551 (E.D. Pa. 2006).   I must affirm the agency's decision unless Plaintiff shows that it is

> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (2) obtained without procedures required by law, rule, or regulation having been followed; or
> (3) unsupported by substantial evidence.

5 U.S.C. § 7703(c); see also Chambers v. Dep't of Interior, 515 F.3d 1362, 1367 (Fed. Cir. 2008); Clark v. U.S. Postal Serv., 989 F.2d 1164, 1167 (Fed. Cir. 1993).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).   It is "more than a mere scintilla," but may be less than a preponderance of the evidence.   Id.; see also Harold, 450 F. Supp. 2d at 551.

If an agency bases an "unacceptable" rating on an employee's failure to perform adequately with respect to one or more subelements, "the agency must present substantial evidence that the employee's performance warranted an unacceptable rating on the critical element as a whole."   Adkins v. Dep't of Hous. & Urban Dev., 781 F.2d 891, 895 (Fed. Cir. 1986) (citing Shuman v. Dep't of Treasury, 23 M.S.P.R. 620, 628 (1984)).   To meet this burden, the agency must "demonstrat[e] that the employee knew or should have known the significance of the subelement or subelements at issue."   Id.

## II.  DISCUSSION

### A.  Evidentiary Sufficiency (Count I)

Plaintiff argues that because the administrative record does not include spreadsheets, computer screenshots, or other examples of his purported incompetence, the evidentiary basis of his termination is necessarily insufficient.   (Doc. No. 24, at 18-20.)   Yet, the record shows quite plainly that Plaintiff did not adequately maintain the Docket despite the EPA's repeated assignment and reassignment to him of this most basic duty.

"Anderson found [Plaintiff's] performance unsatisfactory based primarily on his failure to complete the first two [PIP] tasks."   Lee, 115 M.S.P.R. at 552.   She detailed Plaintiff's shortcomings in her five-page "PIP close-out memorandum."   (MSPB R. tab 4g.)   Her hearing testimony—which the ALJ credited—was equally damning.   (MSPB Hrg. Tr. 60-176.)

*PIP Task #1*

As I have described, Critical Element #1 of Plaintiff's 2008 Performance Plan required him to coordinate the Federal Docket.   (MSPB R. tab 4h, at 5.)   Plaintiff's first PIP assignment broke that down: Plaintiff was to identify "small quantity generators" for removal from the Docket, and crosscheck the Docket against CERCLIS.

Identifying small quantity generators required Plaintiff simply to enter the facility name into a computer and delist the site if coded "small quantity generator."   (MSPB Hrg. Tr. 88:4-22.) Plaintiff nonetheless failed to identify several sites that should have been delisted, and erroneously proposed delisting an NPL site.   (MSPB R. tabs 4g, 4i.)   Anderson found that delisting "particularly disturbing," as Plaintiff should have known that NPL sites pose an environmental threat that requires ongoing monitoring.   (MSPB R. tab 4g, at 2.)

As I have described, PIP Task #1 also required Plaintiff to flag Docket sites in CERCLIS, and crosscheck CERCLIS with the Docket, updating each as needed. (MSPB R. tab 4g.) Once again, the record shows that this was an important, but "fairly straightforward exercise." (MSPB R. tab 4i, at 2.) Yet, by the PIP's conclusion, Plaintiff had not entered any sites into CERCLIS, nor had he identified any CERCLIS listings for addition to the Docket. (MSPB R. tab 4g, at 2.) The record also shows that Plaintiff erroneously failed to flag in CERCLIS "at least 31" different Docket sites. (MSPB R. tab 4g, at 2.)

*PIP Task #2*

In coordinating the Docket, Plaintiff was to compile spreadsheets of proposed updates for all Region III Docket sites. (<u>See</u> MSPB Hrg. Tr. 151-52.) To ensure that Plaintiff understood this assignment, Anderson and Plaintiff together compiled the spreadsheet for Washington, D.C. (MSPB Hrg. Tr. 152:2-6.) Anderson alone compiled the Maryland spreadsheet—a task that took "half a day." (MSPB Hrg. Tr. 133:3.) Only four states remained, which, as the ALJ observed, "didn't leave a whole lot" for Plaintiff. (MSPB Hrg. Tr. 152:4-5) Remarkably, at the conclusion of the 60-day PIP, Plaintiff had not completed spreadsheets for a single state. (MSPB R. tab 4i.) Those entries he made included numerous errors. (MSPB R. tab 4i.)

Anderson's frustration was evident: "these [Docket] spreadsheets had been an issue for over a year and they still contain[ed] errors and [were] incomplete." (MSPB R. tab 4i, at 1; <u>see also</u> MSPB Hrg. Tr. 81:3-7 ("He needed to complete some of the assignments that had been started a year previously. These spreadsheets had been—his assignment was to complete these spreadsheets since November of 2007 and they had not yet been completed.").) Anderson had met with Plaintiff every fortnight to discuss his projects and answer his questions. (MSPB Hrg.

Tr. 72:6-23)   Plaintiff nevertheless continued to submit work that was incomplete or incorrect. (MSPB R. tab 4g, at 2 ("[Y]ou submitted discovery and data entry forms for sites that are proposed for deletion from the Docket.   I have had to cull out these forms to ensure that they are not entered into CERCLIS.").)

Anderson's hearing testimony and her PIP close-out memorandum also include detailed descriptions of Plaintiff's other shortcomings—descriptions I need not set out here to make a substantial evidence determination.

Plaintiff argues that the ALJ should have credited his testimony and given Anderson's testimony and memorandum less weight.   (Doc. No. 33, at 41 ("[I]t was manifestly unreasonable for the Board to completely disregard Lee's testimony regarding his performance, while crediting Anderson's testimony . . . .").)   I may not, however, revise those determinations.   Williams v. United States, 37 F. App'x 509 (Fed. Cir. 2002) (per curiam) ("The trial court's task was not to reweigh the evidence, but to determine whether substantial evidence supported the [agency's] decision.").   Plaintiff argued to the ALJ and the full Board (as he does here) that without screenshots and spreadsheets, Anderson's testimony and memoranda were unworthy of belief. (See Appellant's Pet. for Rev. 36, Mar. 1, 2010 ("[T]he Agency failed to produce any of the said spreadsheets at the hearing or as part of the Agency record.").)   The ALJ nonetheless chose to credit Anderson, who described Plaintiff's poor work in detail.   The Agency's "failure" to introduce the poor work itself is not significant.   Substantial evidence certainly supports the EPA's decision to fire Plaintiff for unacceptable performance.

*The Importance of PIP Tasks #1 and #2*

Once again, Anderson determined that Plaintiff's performance on Critical Element #1 of the 2008 Performance Plan remained unsatisfactory based largely on Plaintiff's failure to complete successfully PIP Tasks #1 and #2 (which were subelements of Critical Element #1): crosschecking databases and proposing Docket updates. The EPA was thus obliged to show that Plaintiff knew or should have known the significance and relative importance of these tasks. See Adkins, 781 F.2d at 895 (citing Shuman, 23 M.S.P.R. at 627-28). Plaintiff argues that the Board's finding that Plaintiff had such knowledge is not supported by substantial evidence. (Doc. No. 1 ¶¶ 68-69; Doc. No. 24, at 15-22.) Once again, I disagree.

These subelements obviously were essential "part[s] of the docket coordinator's job." (MSBP Hrg. Tr. 85:23; see id. 105:5-9 ("In Region 3, the docket coordinator is primarily responsible for additions to the docket, quality assuring the data that's on the docket, managing revisions, [and] deletions . . . .").) In its official description of the Coordinator position, the EPA stated that management of the Docket was the Coordinator's "primary purpose," and that this included "revising and adding to the Docket." (MSPB R. tab 4v.)

Moreover, Plaintiff was originally assigned these tasks in "November of 2007 and they had not yet been completed [by September 30, 2009]." (MSPB Hrg. Tr. 81:5-7; see id. 85:7-10 ("Now one of the reasons that this work assignment is in this PIP is because, you know, this has been, had been an ongoing assignment for a year.").) He had been instructed "finally [to] complete" the assignments in March of 2008. (MSPB R. tab 4s, at 1-2.) The long pendency of these fundamental assignments and explicit instruction to "complete" them six months before the conclusion of the 60-day PIP should have confirmed their importance. The Board cited this and

other record evidence in finding that Plaintiff "was or should have been aware that the successful completion of [these tasks] was central to the very purpose of the regional Docket Coordinator position." Lee, 115 M.S.B.R. at 553.

The gravamen of Plaintiff's argument is that he could not reasonably be expected to know his job's central purpose, and could not reasonably be expected to comprehend the importance of long-pending (and repeated) assignments intended to fulfill that purpose. To state Plaintiff's argument is to refute it. Plainly, there is substantial evidence to support the Board's finding that Plaintiff knew PIP Tasks #1 and #2—subelements of Critical Element #1—were important.

In sum, because substantial evidence supports the Board's decision to uphold Plaintiff's termination, I will enter judgment in the Government's favor on Count I.

### B. Procedural Adequacy (Count II)

Plaintiff contends that: (1) the Board's approval of an appraisal period of "significantly less than one year" was clearly erroneous; (2) its finding that Plaintiff's 2008 Performance Plan contained only three "critical elements" was arbitrary and capricious; and (3) the EPA committed "harmful procedural error" in developing and initiating the PIP. (Doc. No. 24, at 23-30.) These claims are meritless.

*Appraisal Period*

Anderson evaluated Plaintiff's job performance from February 9, 2008, to September 30, 2008. (Doc. No. 24 ¶ 4 (citing MSPB R. tab 4h).) Plaintiff argues that because this was less than one year, his termination was: 1) invalid *per se* under 5 U.S.C. § 4303(c)(2); or 2) invalid because it did not conform to the EPA's designated appraisal period. (Doc. No. 24, at 24-25.) The Federal Circuit has rejected both contentions. Weirauch v. Dep't of Army. 782 F.2d 1560, 1563

(Fed. Cir. 1986) (holding: 1) section 4303(c)(2)'s one-year requirement "represents a permissible maximum, but not minimum, appraisal period for an individual employee;" and 2) "an employee's rights are not tied to the officially designated appraisal period of the agency").

Plaintiff next contends that

> there is nothing in writing in the record which reflects that in February, 2008 [Plaintiff] was informed that for the shortened performance "year" 2008, he could be fired if he did not meet Anderson's expectations in a period of 8 months.

(Doc. No. 24, at 25-26.)   I agree that the EPA was required to "communicate the critical elements and performance standards to [Plaintiff] at or before the beginning of the appraisal period which forms the basis of the adverse action."   Weirauch, 782 F.2d at 1563.   Plaintiff's assertion that the Agency failed to do so, however, is contradicted by the record.

The 2008 Performance Plan states that Plaintiff's appraisal period was to end on September 30, 2008.   (MSPB R. tab 4h.)   Plaintiff's signature, dated "2/27/08," appears two lines below. (MSPB R. tab 4h, at 2.)   The record thus explicitly supports the Board's conclusion that the EPA notified Plaintiff of the Plan's eight-month duration at its February 2008 inception.   There was no procedural inadequacy.

_The 2008 Performance Plan_

Plaintiff next argues that Critical Element #1 of the 2008 Performance Plan impermissibly consisted of some thirty "critical elements"; the governing Collective Bargaining Agreement caps the number of critical elements at five.   (Doc. No. 24, at 26-29.)   As I have discussed, poor performance in one or more subelements of a critical element can warrant removal without automatically converting the subelements into critical elements.   See, e.g., Rogers, 814 F.2d at 1551 (critical element of teacher's job is to assess student progress; subelements   include

developing assessment plan, providing feedback to students, and establishing written grading system); Shuman, 23 M.S.P.R. at 629-30 (critical element of IRS Revenue Officer's job is to conduct investigations; subelements include interviewing taxpayer, identifying delinquency's cause, and determining appropriate corrective action).

I have appended to this Memorandum the 2008 Performance Plan's "Program/Project Management Focus Areas for [the] Federal Docket." Among the assigned tasks was an instruction to "[r]esolve inconsistencies between the information on the Docket and information in [other] databases [such as CERCLIS]." (MSPB R. tab 4h, at 5-8.) The Agency then broke this instruction down further, requiring Plaintiff to "[c]omplete the Docket spreadsheets," "[t]rack submission of Docket-related documents," and "[e]nsure that CERCLIS is updated for all Docket sites." (MSPB R. tab 4h, at 5-8.) Not surprisingly, the Board found that the "focus areas listed under Critical Element # 1 of [Plaintiff's] February 2008 [P]erformance [P]lan are not distinct critical elements but rather subelements of a single responsibility, *i.e.,* serving as regional Docket Coordinator." Lee, 115 M.S.P.R. at 551.

Once again, the EPA repeatedly gave Plaintiff the opportunity adequately to perform the Docket Coordinator's most fundamental duty: coordinate Region III's component of the Federal Docket. Anderson testified that because Plaintiff "seem[ed] unfamiliar with [] the responsibilities of the docket coordinator," she "spelled out his responsibilities more specifically in [the 2008 Performance Plan], in terms of focus areas." (MSPB Hrg. Tr. 75:16-20.) With each of Plaintiff's failures, the Agency broke Plaintiff's job down further and further—down to its discrete, constituent tasks—all in an apparent effort to spoon-feed Plaintiff his day-to-day duties. This procedure was obviously intended to help Plaintiff improve his performance.

The Performance Appraisal and Recognition System was designed to facilitate communication of performance standards to the employee. (MSPB R. tab 4w, at 12-13.) By setting out bite-sized focus areas, Anderson sought to communicate Plaintiff's duties as clearly as possible. The Board correctly determined that, in doing so, she did not add "critical elements" to Plaintiff's 2008 Performance Plan.

*Development and Initiation of 2008 PIP*

Once again, after the EPA notified Plaintiff that his performance on Critical Element #1 of the 2008 Performance Plan was "Unacceptable," it placed him on a 60-day PIP. That PIP gave Plaintiff a renewed opportunity to perform acceptably the tasks comprising Critical Element #1. See 5 C.F.R. § 432.104.

Again protesting the EPA's breakdown of his job into constituent tasks, Plaintiff argues that the "she[e]r number of tasks, and the vagueness in what was involved in discharging his responsibilities" rendered the 2008 PIP invalid. (Doc. No. 24, at 31.) Plaintiff does not explain (nor can I see) how his assignments could have been at once impermissibly detailed and impermissibly vague. In fact, they were neither. As I have described, the EPA reiterated Plaintiff's duties in Performance Plans and PIPs to help Plaintiff improve his performance. By describing each constituent task of "Docket coordinating," the Agency sought to diminish the likelihood that Plaintiff would overlook or ignore any task. The Collective Bargaining Agreement *requires* that a PIP be "specific" and include a "list of assignments with due dates." (MSPB R. tab 4w, at 22-23) Indeed, the explicit purpose of a PIP is "to identify . . . the actions that must be taken by the employee to improve performance." (MSPB R. tab 4w, 21-23.) The ALJ agreed with Anderson that "the number of things [Plaintiff] had to resolve [was] minimal,"

and that Plaintiff had "adequate time to complete them." (MSPB Hrg. Tr. 131:13-23.) Plainly the PIP assignments were detailed and specific, yet not so numerous as to render 'unreasonable' Plaintiff's opportunity to demonstrate acceptable performance. See 5 C.F.R. § 432.104 (requiring EPA to "afford the employee a reasonable opportunity to demonstrate acceptable performance").

Plaintiff also argues that the EPA failed to consult adequately with him in developing the 2008 PIP. (Doc. No. 24, at 32.) He apparently bases this claim on the CBA, which provides that "the supervisor shall develop, in consultation with the employee and, if requested, her or his union representative, a written Performance Improvement Plan or PIP." (MSPB R. tab 4w, at 21.)

Plaintiff acknowledges that he received Anderson's memorandum inviting him "to submit . . . any suggestions you have regarding the content of your PIP." (Doc. No. 24, at 32-33.) Anderson testified that Plaintiff also had opportunity to "provide[] input" with respect to the PIP during a July 30, 2008 meeting she held with him and his union representative. (MSPB Hrg. Tr. 92-95.) Accordingly, I agree with the ALJ and the Board that Anderson met the CBA's limited consultation requirement by twice inviting Plaintiff's input.

Further, as the Board correctly noted, regardless of whether and to what degree Anderson consulted with Plaintiff, she had no obligation to incorporate his suggestions into the PIP. Lee, 115 M.S.P.R. at 554; (see also MSPB R. tab 4w, at 21-23 ("A PIP should be in the form of a memorandum from the immediate supervisor to the employee . . . . The employee's signature on the PIP . . . does not signify concurrence.").) Moreover, Plaintiff has not clearly indicated what "suggestions" he would have made had his consultations with Anderson been more substantial. He thus has not shown that additional consultation would have affected the PIP's content, let alone altered the EPA's decision to terminate him. Lee, 115 M.S.P.R. at 554 (citing Stephen v. Dep't of

Air Force, 47 M.S.P.R. 672, 681 (1991)).  Accordingly, even assuming, *arguendo*, that consultation with Plaintiff was inadequate, this procedural error was certainly harmless.  See 5 C.F.R. § 1201.56 (harmful error is "[e]rror by the agency in the application of its procedures that is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error.").

I will not disturb the EPA's decision to terminate Plaintiff for procedural invalidity.  The Government is entitled to summary judgment on Count II.

## DISCRIMINATION CLAIM

### I.      **Legal Standards**

When hearing the appeal from an MSPB final decision in a mixed case—one alleging both administrative error and Title VII discrimination—the district court must review discrimination claims *de novo*.  5 U.S.C. § 7703(c).  Accordingly, I must apply the usual summary judgment standard to Plaintiff's national origin discrimination claim.  See Fed. R. Civ. P. 56.

Summary judgment is warranted "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party must initially show the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  An issue is material only if it could affect the result of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The district court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.  Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  If even then the court determines that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.  See Celotex, 477 U.S. at 322; Wisniewski v. Johns-Manville

<u>Corp.</u>, 812 F.2d 81, 83 (3d Cir. 1987).

To make out a *prima facie* case of discrimination, a Title VII plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the subject job; (3) he suffered an adverse employment action; and (4) non-members of the protected class were treated more favorably or hired to replace him.  <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973); <u>see also</u> <u>Williams v. Seven Seventeen HB Philadelphia Corp. No. 2</u>, 51 F. Supp. 2d 637, 641 (E.D. Pa. 1999).  "If the plaintiff succeeds, the burden of production shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.'"  <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994) (emphasis removed) (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802.).   If the defendant makes such a showing, the plaintiff must prove that the employer's stated reason is pretextual and that impermissible discrimination motivated the termination. <u>Williams</u>, 51 F. Supp. 2d at 641-42.

### A.  Discussion—National Origin Discrimination (Count IV)

Although vigorously disputed by the Government, I will assume, *arguendo*, that Plaintiff has made a *prima facie* showing of discrimination: 1) he is a member of a protected class; 2) he is qualified for the position of Environmental Engineer; and 3) he suffered an adverse employment action.  Finally, there is at least a genuine issue of material fact as to whether the EPA treated comparable, non-Chinese-American employees more favorably than Plaintiff.  In response, the Government has articulated a legitimate, non-discriminatory reason for Plaintiff's termination: his poor performance.  Plaintiff has failed to produce any evidence "from which a factfinder could reasonably either: (1) disbelieve [the EPA's] articulated legitimate reasons [for terminating Plaintiff]; or (2) believe that an invidious discriminatory reason was more likely than not a

motivating or determinative cause of [the EPA's] action." <u>Fuentes</u>, 32 F.3d at 764.

In reviewing the record, I have construed all facts in the light most favorable to Plaintiff and made every inference in his favor. As the Third Circuit has held, however, "the mere existence of some evidence in support of the non-moving party will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-moving party on the issue." <u>Petrucelli v. Bohringer & Ratzinger</u>, 46 F.3d 1298, 1308 (3d Cir. 1995) (citing <u>Anderson</u>, 477 U.S. at 249).

Plaintiff has produced no evidence that Anderson—whose poor evaluation of Plaintiff caused his firing—harbored any anti-Chinese bias. Rather, Plaintiff believes that Anderson's supervisor, Henry Sokolowski, harbored such prejudice and "brought in Kathleen Anderson as [Plaintiff's] immediate supervisor with the specific mission of getting rid of [Plaintiff]." (Doc. No. 33, at 23.) Construing the record as liberally as possible, I can find no evidence to support this theory. The record does not support Plaintiff's allegation that Anderson "was non-competitively appointed to the supervisory position by Sokolowski." (<u>Id.</u> at 23.) Uncontradicted evidence shows that before Anderson's initial appointment as Plaintiff's supervisor, the position was posted on the Agency's internal website and several applicants were considered. (<u>Id.</u> Exh. K; <u>see also</u> Doc. No. 24 Exh. H, at 13:4-6.) Moreover, Plaintiff has produced no evidence even suggesting that Anderson intended to "get rid" of Plaintiff. On the contrary, Anderson testified without contradiction that her evaluations of Plaintiff were in keeping with the Agency's PARS protocols. (MSPB Hrg. Tr. 72-99.) Additionally, the record is uncontradicted that after Plaintiff's "Unacceptable" 2007 performance rating, Plaintiff was given three more opportunities to improve his performance: the 2007 PIP, the 2008 Performance Plan,

and the 2008 PIP. With each evaluation, Anderson broke down Plaintiff's tasks in greater detail to help Plaintiff improve his performance and so keep his job.

Plaintiff has also failed to produce sufficient evidence that Sokolowski harbored "anti-Chinese" sentiment. According to Plaintiff, Sokolowski "never said anything outright that's anti-Chinese." (Lee Dep. 46:23-24 Nov. 3, 2011.) Nevertheless, Plaintiff argues that Sokolowski has implicitly revealed his bias. Plaintiff offers a 2006 email (written some three years before Plaintiff's firing) in which Sokolowski wrote to the IT department

> Cesear Lee in the Site Assessment Branch of my office spends unusually large amounts of time on his computer each day using earphones. I have personally observed this for some time. He is very much a mysterious person and except for lunch breaks or visits to the men's room, he rarely comes out of his office.

(Def. App. 424.) In addition, Plaintiff testified to Sokolowski's evaluation of another Asian employee some two years before Plaintiff's firing in which Sokolowski provided oral feedback after a role-play training exercise, as follows:

> [A]t a retreat, [Sokolowski] evaluated each of the people who were in—in the so-called classroom games. And for—for one of the comments he made about one of the females, Sun, he said she was not aggressive enough.

(Lee Dep. 47:10-14.)

Sokolowski's highly ambiguous statements, without more, are insufficient to create a factual dispute respecting Sokolowski's motivation. Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 743-44 (1st Cir. 1995); see DiFlorio v. Kleckner, Civ. No. 11-4405, 2012 WL 748910, at *7 (E.D. Pa. Mar. 7, 2012) (statement that the company was "looking to change the culture" did not support inference of age discrimination.). Plaintiff's personal opinion that the comments show anti-Chinese bias is simply insufficient. McMillian v. Svetanoff, 878 F.2d 186,

190 (7th Cir. 1989); see also Martin v. Port Auth. Transit, 115 F. App'x 556, 558 (3d Cir. 2004) (evidence of allegedly racist statement properly excluded because "comment did not contain any derogatory racial epithets; [and] in fact . . . did not even mention race.").

Finally, Plaintiff concedes that he was fired based on *Anderson's* poor evaluations of him. (Doc. No. 24, at 6 ("Anderson turn-keyed everything in terms of the decision [to terminate Plaintiff.]") (quotations omitted).)   Accordingly, even if I construed Sokolowski's comments as reflecting some anti-Chinese bias, Plaintiff has not shown how Sokolowski's purported bias infected Anderson's determination that Plaintiff repeatedly performed his job incompetently. Nor has Plaintiff shown that Sokolowski was even involved in the decision to fire Plaintiff.   On the contrary, Plaintiff concedes that another Agency supervisor, James Newsom, was "the Agency's decision-maker."   (Id. at 13.)   Again, Plaintiff presents no evidence that Newsom's decision to terminate Plaintiff was tainted by anti-Chinese bias.   (Cf. MSPB Hrg. Tr. 98:17-19, 200:5-13 (Anderson and Sokolowski testified that they never even spoke with Newsom about his decision to terminate Plaintiff).)   Plaintiff has thus failed to offer evidence "of a 'causal nexus' between [Newsom's] decision to terminate the plaintiff and [Sokolowski's] discriminatory animus."   Romans v. Michigan Dep't of Human Servs., 668 F.3d 826, 836 (6th Cir. 2012).

Plaintiff can survive summary judgment only if he shows that the EPA's stated reason for his termination was pretextual.   See Burton v. Teleflex Inc., 707 F.3d 417, 427 (3d Cir. 2013). Plaintiff must thus "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'"   Fuentes, 32 F.3d at 765 (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992).   Plaintiff

has failed to do so.

Plaintiff attempts to discredit Anderson's evaluations by suggesting that another supervisor respected Plaintiff's work.  (Doc. No. 33, at 28-30.)  Plaintiff thus offers an unsolicited email from temporary supervisor Charlene Creamer, who thought well of Plaintiff but was not responsible for managing his work assignments.  (Id. Exh. K.)  More significantly, Ms. Creamer acknowledged that she was unfamiliar with Plaintiff's Performance Plans, which set forth the criteria on which any assessment of Plaintiff's work must be based.  (Id. Exh. K, at 25-28, 38.)

Plaintiff also suggests that his poor evaluations were the result of his inadequate training. Plaintiff offers virtually no evidence to impugn his training or to suggest that any "inadequate" training was the result of anti-Chinese bias.  Moreover, by this argument, Plaintiff impliedly concedes that his performance was, in fact, poor.

Finally, Plaintiff argues that discriminatory intent is evidenced by the EPA's purported failure to adhere to its own policies respecting the 2008 Performance Plan and PIP: exceeding five critical elements, imposing an unreasonably onerous PIP, and violating the CBA's consultation requirement.  (Id. at 30-31.)  As I have discussed, however, the EPA adhered to its PARS protocols in evaluating Plaintiff.   The care and detail reflected in the Performance Plans and PIPs reflected Anderson's intent to help Plaintiff improve his performance.   There is no evidence that they had anything to do with his national origin.  E.E.O.C. v. Muhlenberg Coll., 131 F. App'x 807, 812 (3d Cir. 2005) (in Title VII case, procedural irregularity is not material unless tied to discrimination).

Plaintiff thus has not demonstrated any inherent weakness in the EPA's decision to fire him for incompetence.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000).

No reasonable factfinder could conclude that Plaintiff's national origin motivated his firing. On the contrary, the record overwhelmingly demonstrates that Plaintiff's poor performance cost him his job. Accordingly, the Government is entitled to summary judgment on Count IV.

## **CONCLUSION**

For the reasons stated, I will enter judgment for the Government on Counts I, II, and IV.

An appropriate Order follows.

*/s/ Paul S. Diamond*
_____
Paul S. Diamond, J.

**APPENDIX**

**Program/Project Management**
**Focus Areas for Federal Docket**

- Identify sites that are eligible for Docket listing when they receive notification of hazardous substance release under CERCLA Section 103 and hazardous waste activity under RCRA Sections 3005, 3010, and 3016.

- Prepare deletions/revisions for Docket Update #24. Review and comment on lists of Docket additions, deletions, and corrections provided by EPA Headquarters to ensure that all information is accurate.

- Resolve inconsistencies between information on the Docket and information in databases used to obtain information for the Docket (i.e., RCRAInfo, CERCLIS, Emergency Response Notification System (ERNS), and the RCRA 3016 Inventory. These activities include but are not limited to the following:
  o Complete the Docket spreadsheets for all columns, including the dates of when notifications have been sent and documents received. The spreadsheet must be maintained and updated on the H drive.
  o Track submission of Docket-related documents, such as PA and SI reports.
  o Ensure that CERCLIS is updated for all Docket sites:
    ▪ For all sites from whom a PA has been received, ensure that the start date has been entered into CERCLIS by preparing and submitting the appropriate data entry forms.
    ▪ Ensure that all Docket site decisions are entered into CERCLIS using the appropriate data entry forms.

- Make decisions regarding inclusion of facilities on the Docket in consultation with Federal agencies, the EPA Headquarters Docket Coordinator, and other relevant EPA staff. These activities include but are not limited to the following:
  o Investigate and draft a response for the following policy issues. This may be accomplished by, among other things, canvassing FFRRO and other regions.
    ▪ Determine whether the definition of "site" for Docket purposes has changed since the original FR notice.
    ▪ Determine whether a PA/SI is still required for the entire "site", however the term "site" ist now defined and determine how to address a site that is owned by one federal entity but is leased to one or more other federal entities with their own RCRA and CERCLA reporting requirements.
    ▪ Determine whether there is now a disconnect between the definition of "site" for NPL listing purposes and the definition of "site" for listing on the Docket. If there is a contradiction in terms, determine how sites should be listed on the Docket.
    ▪ Determine how listing of MMRP sites would be affected by the current definition of "site".
  o Propose changes to the Docket based on this investigation.

- Provide Docket information to regional records centers that manage site file records.

- Provide Docket information to the public, other Federal agencies, and local governments, when appropriate.

- Communicate Docket requirements to appropriate contacts at Federal facilities included on the Docket. Ensure that all valid Docket sites have been appropriately notified of their requirement to submit a PA. These activities include but are not limited to the following:
  o Send notifications to all sites that have yet to receive a notification that they must submit a PA. This includes sites where notifications have been sent but came back as undeliverable.
  o Send second notification to all sites that have not received a second notification.

- o For any Federal entity that has fewer than five sites in one State: Prepare 104(e) letters for sites that have received appropriate notification of their obligations under the Docket but have yet to submit a PA.
- o For any Federal entity that has more than five or more sites in one State: Identify the appropriate contact with oversight responsibilities and send a letter outlining their Docket obligations for these sites and request a plan and schedule for completion.
- o Follow up as appropriate to all notifications, 104(e) letters, and letters to federal entities with multiple sites.

- For all sites that have decisions pending, arrange with appropriate SAM to finalize the PA/SI.

- Perform all other duties related to maintaining the Federal Docket.